25, 20, 54, Derek Antol versus Robert S. English. Target not to exceed 15 minutes per side. Mr. Bostick for the plaintiff appellant. Good morning, your honors. May it please the court. Nick Bostick on behalf of the appellant. Mr. Antol, I'd like to reserve five minutes for the appeal. Fine. Your honors, I assert that Mr. Antol should prevail as to count one of the complaint in the district court's order by proper application of this court's preference for resolving immunity at the Rule 56 stage instead of the Rule 12 stage and by properly applying the plausibility standards of Ashcroft. Now, the plausibility standard allows, requires certain inferences and in this situation, those inferences all are supposed to be in the light most favorable to the plaintiff. In our opinion, the district court's decision did not grant favorable inferences to the non-moving party. And obviously, in my briefing, I picked apart the search warrant affidavit pretty much line by line or paragraph by paragraph and I fully understand that is not the total, a proper approach for analyzing search warrants. We look at the totality. And when we look at the totality, the affidavit gave the overall impression of a situation that created illegal delivery of marijuana, tax evasion and money laundering. And even at one point, they were talking about enterprise, criminal enterprise. So that prompted the scope of the search, which included 18 different categories of personal property, records or data. Now, the materiality of the omissions is obviously something that's important because the police are entitled to rely on a valid warrant and of course, including false statements or making omissions with intent to mislead is one of the exceptions for them to be able to rely on that warrant. The false statements about my client not possessing a medical marijuana card or material to the delivery of marijuana charge because of Michigan's Voter Initiated Act in 2008, we call the Michigan Medical Marijuana Act, and the Voter Initiative of 2016, which is the Regulation and Taxation of Marijuana Act. Both of those have certain defenses in there and by claiming that he had no card, the police took out the ability to claim the Medical Marijuana Act as any sort of a defense. Even if he had the card, he wouldn't be able to grow it and sell it at the store, right? The selling is the problem. Yeah, the selling is the problem. So why is that material about the card? I mean, in other words, according to the affidavit, they have been going to this store, it seems like for a long time, for some reason, getting free marijuana, whatever, buying the accessory. They are told that the owner grows it. They're told that it's not on the premises. They make an, you know, and they conclude that one of the places that would be likely for him to grow it would be at his residence. And so they get the warrant for that, putting aside all the financial stuff. Why does that, why doesn't that just satisfy the, or at least as a matter of good faith even? The false statement on the medical marijuana card only takes out defenses under the Medical Regulation and Taxation of Marijuana Act. But the problem is, the reviewing magistrate needs to know that he does have a card, that his card allows him to possess his own plants because we're not into quantities yet. Each of these purchases was for an amount that would be under the criminal provisions of the Marijuana Regulation and Taxation Act. So that's another part of the issue of those defenses being available. The quantities were under the thresholds for that particular act. Well normally, if there's a, say a false statement, a knowingly false statement in an affidavit, we would strike that statement and we'd look at the rest of the affidavit. So I gather that you're telling us that we would need to strike the officer's statement that your client did not have a medical marijuana card, but we also would be needing to deal with the omission of the fact that he did have a medical marijuana card, is that right?  But I guess, why don't we just look at the affidavit without any statement about a medical marijuana card, one way or the other, because we take out what you say is the false statement. So why isn't there enough in this affidavit taking out all the so-called false statements to allow for the search warrant to be issued? The large part of that is the overall scope. All of the crimes that they claimed that they were investigating, there was not probable cause for any of them. The marijuana, the delivery of marijuana is a different, you have to set that aside. But here's the factual dispute. The gifting, and this is where the regulation and taxation of the Marijuana Act comes into play. The gifting is not a crime. So the totality here is my client is saying, I sold pipes and gifted marijuana. The police simply came to the reviewing magistrate and said, no, he's selling marijuana and gifting pipes. I mean, that's just a classic factual dispute as to what the nature of these transactions really were. But back to your question, Judge Moore, when the false statements are set aside and there are material omissions, the review includes the material omissions minus the false statements. That gets us into the 38 tax payments that I listed in the complaint that he made to taxing authorities for two years. And your honor, the timeframe, part of it was COVID. That was part of the delay. But the other from the affidavit. So when you add back in all of those tax payments, now you negate the tax evasion allegations because it must be with an intent to evade or avoid payment of tax. Well, he was paying the taxes. The officer had the tax records, I mean the bank records, he knew those tax payments. How would that affect the search? Let's say they can search for marijuana, but the financial part of it is not good. Would that affect any of this? I mean, the warrant would have issued anyway, but is it the scope would have changed? So you can't go through the papers or whatever. I mean, I'm not sure why. My sense is you have to knock out both of these rationales. Is that right? I do. I mean, obviously, you know, we have the preference for warrants and we have the warrant. I have an uphill battle as soon as I start to challenge a warrant. Maybe there's a lot to debate. But is the claim plausible? Could the favorable inferences from a jury's perspective lead them to conclude that reliance on this was unreasonable because of all of the false statements and all of the material omissions? So we can argue about the at some other point. In my remaining time, I just want to mention accounts to it. I mean, this is a qualified immunity case, right? Well, Rule 12, yes. So the law has to be clear. You have to say the warrant shouldn't have issued and it was clearly established, essentially. Everybody would have known, every officer would have known that they couldn't rely on this warrant as part of the query established. But we create a factual dispute by pointing out the material omissions and the false statements. And then the jury decides whether or not reliance on it was reasonable and whether or not it should have issued. So your other claim has to do with the refusal to allow him to use the bathroom during the time that he was seized and taken outside of the house without his shoes or without a covering over his top. Does the records indicate that he was just wearing shorts or pants or something like that? Yes. I saw the memo that this court received a video from the district court and he steps out wearing blue jeans. Okay. So what is the legal theory of your complaint then? Is it that there's excessive force or what is the constitutional violation? Unreasonable detention under the Fourth Amendment. And then some courts use the Fourteenth Amendment with a substantive violation, which is a failure to recognize basic human needs and basic human decency. So should, if we were establishing the law here, should it be that when someone has been seized, was he arrested? He wasn't arrested, but he was handcuffed. Correct me when I'm wrong here. He was handcuffed with his hands behind his back, correct? Initially. And taken outside the house in April in Michigan. And he was provided foot coverings and a top because it was probably cold out there. And then he said he needed to urinate and this was all within approximately a half an hour of his being taken out of the house, correct? That developed within the first three to five minutes. That he's taken out and he says he needs to urinate. Yes. And the officers say, well, too bad, you know, you're out here and if you need to go, you need to go in the front yard, right? Yes. But then as soon as he does urinate, he's taken back into the house. And in the interim, he had been put in a police van for an interview. After the interview, it's when he urinates. There were more requests after the interview, denied, urinates in the minute, he's marched back up into the house. Okay. I just wanted to be sure. So your theory is it's an unreasonable detention under the fourth? Under the fourth. And then because of what I found in my research, some courts had applied the due process clause. So I put that in as an alternative legal theory, but the conduct is the same. Okay. Further questions? Thank you. Good morning. May it please the court. Assistant Attorney General Tyler Kitzmiller appearing on behalf of the defendant, Michigan State Police Troopers. This court should affirm the district court's grant of qualified immunity on all three claims because even accepting the plaintiff's allegations as true, they have failed to plead a violation of any clearly established law. First, the troopers relied on a judicially authorized search warrant supported by probable cause. Second, the fourth amendment claim of the excessive force fails because no existing precedent clearly established that Trooper Joseph's conduct in denying Mr. Antle's request. I have a question on the warrant. Why is, what is the nexus between the house and the kind of the suspected drug crime? Normally, in a lot of our cases, I would say, we, there are drug sale cases where the drug dealer is observed going from his house, you know, meeting the confidential informant, then goes back to the house. And we say, okay, so there's a nexus, we can search the house. What's the nexus here? The nexus here would be, and this is considering facts that are not even challenged by Mr. Antle's complaint. The nexus here is that when these buys were happening, employees indicated that, and this is knowing that Mr. Antle is the owner, which is unrefuted by Mr. Antle even in this complaint, information was given that the owners were the ones growing the marijuana, that they were supposedly caregivers, and that the marijuana being supplied to the Deuce's Wild Smoke Shop were their overages. There's also further information that they were growing it locally and nearby, and then that in combined with... Somebody said within 40 miles or 20 miles, there's some mileage in the affidavit, said something like, it's not here, it's 40, yeah, it's 40 miles away or something, or 20 miles, I don't know, it's one of those, right? But they don't say at his home, or I think the owner is growing it at his home. So how do we get to the house? We get to the house through the training and knowledge of our trooper who puts in the affidavit based on his training and experience. The individuals engaged in this type of conduct typically do this at their properties that they own, in adjacent buildings, sheds, things like that, that are located on those properties. And there's information in the affidavit establishing those types of structures as well on this property. And that's sufficient based on United States v. Sumlin, United States v. Simmons, where circumstantial evidence is allowed. We don't need the direct evidence connecting the activity back to the residence in order for there to be a nexus established here. You can rely on circumstantial evidence, such as that information from the employees in combination with the training and experience of the officer, to be able to establish that nexus, which was done here. And again, that's looking at allegations that remain outside of what Mr. Antle is even challenging as false, or even misleading, which I would note misleading statements do not even come close to rising to the standard of being a deliberately false statement. What about the omission of the tax payments? So, I still don't think that's material to the finding of probable cause. The district court here, and I think the district court's analysis... I mean, the district court, maybe I missed it, but if you have an omission, the district court is supposed to essentially re-examine the warrant, putting in the information that the district court needs to put this tax payment information into this warrant, and then I'm going to re-analyze it. Maybe I missed that, but I didn't see that. So, I think the way the district court looked at this is they focused on the unlawful distribution of the marijuana. That's really the crux of... If we take everything else out, take out the financial information, the financial crimes, anything related to that, you go back to the crux of the affidavit, which is the unlawful distribution of marijuana. Once that's established, you're engaging in a sale involving the unlawful distribution of marijuana. From there, I think the scope of the search then does reach the financial aspects of the crime without even having that financial information attached to it. So, you're just saying the drug part gets you into the house and that's all that matters? If we're looking outside of what is alleged to be false or misleading by Mr. Antle's complaint, there is enough in the affidavit to be able to get us to the house with the nexus test that was utilized by the district court. But the question then is the scope of the actual search. Should it be just to search for the marijuana, or should it include searching for the documents that would show the tax issue? If the omissions of the tax payments should be included in the affidavit, then there would be a question whether the scope of the search should include financial documents, wouldn't there? I think it's still going back to the fact that this is involving the sales at a business, and the sale transactions, tax information, that would still be related to those sales, even without the additional information of collecting the tax returns and putting all that information into the affidavit. I do want to address also Mr. Bostic's references to the provision, we reference it as the Michigan Regulation and Taxation of Marijuana Act. There is a provision in there that Mr. Bostic raised regarding the ability to give or transfer marijuana up to two and a half ounces. This is MCL's 333.27955 subsection 1D. It's important to note for this court that although it does allow for that giving or transfer of marijuana, it is without remuneration. The district court's opinion addresses this. It notes that there's kind of a murky area within Michigan marijuana law, and that what the plaintiff was doing here was at least legally dubious, because there was the selling of a pipe that required the exchange of money, and only with that purchase was there a gift of marijuana being given. That is the reference that Mr. Bostic is making. There is no indication within Michigan clarity on this statute or provision that what was happening there within Deuces Wild is lawful or constitutes a gift under that provision. But if there's unclarity, why would that allow a search warrant of everybody who has this type of arrangement? Well, I think in this context, Your Honor, it goes back to the clearly established. These officers were conducting an investigation, a criminal investigation, that relates back to that conduct. If it's not clearly established one way or the other based on the ambiguities in the statute, that what Mr. Bostic, what Mr. Antle was doing was legal or lawful, clearly under the law. Then this affidavit, an investigation of that criminal activity, it wasn't clearly established that what the officers were doing was looking into something that was actually a legal activity. Could you address the other issue that we were discussing at the end of your opponent on the scope of the restraint of Mr. Antle, and apart from going down the clearly established path? We should probably focus on, was there a violation of a constitutional right there? And it seems very concerning, shall we say, that within a very short time of the police officers essentially forcing him to urinate in the front yard, he was then allowed into the house and making quite suspect what the action of the officers was. Sure, Your Honor. And again, I think we're at the 12B stage. We're taking the allegations pled in the complaint as true at this time. Under Michigan v. Summers and Bailey v. United States, it's clearly established that officers have the ability to detain individuals pursuant to the notice and held that it's proper to do so to avoid any spoliation of evidence, anything like that, particularly in the drug search context. That's not the situation here, was it? Because I think I recall there was 18 officers or 14 officers or some abundant number of officers only seen there at the house. So there was plenty of personnel to prevent destruction, to observe and prevent destruction of evidence. And if he needed to go to the bathroom, there was even enough personnel to go with him to assure no destruction of evidence. So those cases say what they say, but they don't really imply here, do they? So there's no prospect of destruction of evidence or anything of that nature. You had him handcuffed outside, there were plenty of people to accompany him inside, and there was no discernible reason not to let him go to the bathroom. As far as the number, Your Honor, again, this is a 12B motion based on the allegations in the complaint. There's 18 officers, they're also doing a search that same day of the Deuce's Wild Smoke Shop. They start with the house, some of them then move to the business. We don't know at this point, and I probably am not at liberty really to be able to say yet, what all responsibilities were going on that day. I mean, this is a large property, 18 officers, they're there. But they let him in the house immediately after he urinated publicly in the front yard. So that suggests that they were able, those few minutes later, to protect against any harm that he might cause to evidence. And as I understand it, the allegation is that he was handcuffed to a chair. So I guess I'm looking for your giving us a legal theory to say that this is constitutionally acceptable behavior of the police here. We can look to any number of cases that are referenced in our briefs, Your Honor, that indicate, and I know this goes to clearly established, but qualified immunity is a two-pronged test. Yes, but I want to get to whether a constitutional right was violated here. Then we can say, oh, it's not clearly established because there wasn't a Supreme Court case on point or whatever. But it seems to me, and I'm looking for your help, it seems to me that this really, whether you call it excessive force or some other way of expressing the Fourth Amendment violation, that you're not coming up with an explanation of why this is acceptable under the Constitution. Well, again, I think it goes back to they're able to lawfully detain these individuals subject to a search warrant. But is there a limit? What if it had been two hours, three hours? I need to pee. Okay, forget it. You can't. So I assume you would agree at that point there's a problem, right? Right. And I think there's two hours. Is that a problem? One hour? What I'll say is the case law has indicated that one hour or more is where you start to get into issues. And we can look at cases like Little v. Gore. Okay, but then what about Judge Moore's point that, well, it looks kind of pretextual because you just let him back in the house right away. So, yeah, it's not an hour, but it's a half hour with pretext. I would say it's not immediately. I mean, there's a couple of minutes to go by before, according to the complaint, before he's taken back in. There's also, I would note, and this goes back to Mr. Bostic's indication earlier, there's no indication in the complaint when he actually indicates he needs to use the restroom, whether it's in those three to five minutes when he's at the door or if it's, you know, later. I think based on my... But arguably, should it matter? Because people have urgent needs and, you know, he's under the stress of the 18 or 16 or 12 officers coming into his house with a search warrant, taking him outside where he's basically just wearing jeans. And he, whether it's in the first 10 minutes or the first half an hour, he needs to urinate. And there's somebody who can walk with him. He just had his jeans on. He'd been frisked. He had handcuffs on. Somebody can walk with him to go to the bathroom. It just, you know, it seems like at the 12B pleading stage that there should be enough to say that he has alleged a violation of a constitutional right as to whether it is clearly established is another question, but... Right, Your Honor. And I would say again, when we look at the prior case law, it's looking at one hour or more. The 30 minutes, there's been no case law that's established that 30 minutes or less has established a violation. I would also indicate that the complaint frames this as an excessive force claim, not an unreasonable detention claim as indicated by Mr. Bostic earlier. And there's no really room in the complaint for that. What is your theory, though, as to why it was reasonable not to let him go to the bathroom when the request was made? Because you're citing general propositions from, or principles from, the cases. But looking at the specific circumstances at issue here, what's your argument as to why the treatment that was doled out was reasonable? So this is at the beginning of the execution of a drug search warrant, Your Honor. It's within the first 30 minutes. There's going to be a clearing of the house. It's a larger house. It's a larger property, even. And Mr. Bostic even submitted a motion to the support of the size of this property. 30 minutes is not unreasonable for the time it takes to be able to clear the house, for the officers to be able to make sure everything is secure. And also, in that time, he was taken to a van where he was questioned for a period of time until he indicated he's not going to answer any more questions. And then he was offered an opportunity to be able to urinate outside if that's what he wanted to do. And he decided to take that option. But he had to do that because he wasn't let into the house is the problem. So it wasn't that he had an opportunity. That was the last resort available. Correct, Your Honor. And there's other cases, like I indicated, Hunter, Miller, Little. Those cases resulted in actually, I would say, a worse outcome where individuals had to actually urinate or defecate in their own pants without having an opportunity to use a restroom or have the option that Mr. Antle had. I'm not advocating treating people like that as a reasonable thing. I'm not saying that, Your Honor. I'm not. Under these circumstances, seemingly, there were enough personnel to oversee him using the bathroom such that there would not be any opportunity to destroy evidence. And I think, again, it goes back to this being at the early part of the search. Who cares if it was at the early part of the search? He had to go to the bathroom at the early part of the search. So why is that relevant? Because, again, it takes time for these officers to be able to go into a situation that they have no idea about to be able to make sure that the area is safe and secure for themselves, to be able to establish their presence there at the scene, and then to be able to... Who else was in the house or on the scene of people who were non-law enforcement at that time? I believe in the complaint, it may indicate that his wife, or I think it's his now, it may have been his girlfriend at the time, I don't remember, and then also a child. And those were the only people in the house? To my understanding. There were not miscellaneous people in there who needed to be restrained or overseen other than the wife or girlfriend and the child? Correct. That's my understanding. Was he restrained in the sense that he couldn't go knock on a neighbor's house and ask to use their bathroom? I believe he was placed in handcuffs once he came out of the door and he remained in handcuffs. So was that an arrest or is that... It's a lawful detention. Lawful detention. Okay. I see my... Yes. Any further questions? Thank you, your honors. We would respectfully ask this court affirm the district court's decision. Thank you. I was just looking back in the affidavit and I'm not sure which paragraph. It looks like 3H is the one where one of the employees said that the owners provide the marijuana to the store. I don't see any, I haven't, I didn't have time to look it over closely, but that there was any indication as to where they grow it from any of the employees. But the officer in the affidavit says that, I think he says something to the effect that people who grow medical marijuana are often growing it at their home. That is 3II, paragraph 3 double I is where he uses the word often. Of course, the word often, so in his experience, which he put at paragraph 3B, he laid out his experience, which is rather vague. He'd been an officer for seven years, said he does a, he's received training in the area of criminal investigations involving marijuana. But he doesn't say what that training was. And then the word often is also very vague. Don't know that that's enough to give a nexus to the residents. But be that as it may, the other point about the plausibility and the way this affidavit is set up, it's in the complaint that the previous litigation, summary judgment was denied to the members of the West Michigan enforcement team in July 2019. Then three months later, the tip comes in from a quote unquote local drug team, which a Freedom of Information Act request to the Michigan State Police said we don't have any record of that tip. I don't think that that's, that can be overlooked. Now, Brother Counsel mentioned that what Mr. Antle was doing was legally dubious. Well, the Attorney General or the local prosecutor could always move for declaratory action or an injunction and settle that issue as opposed to having a bunch of armed officers wearing bulletproof vests with rams coming into your home early in the morning. In the video, you will see the woman of the home and you'll see the child, the size of the child. I think at some point she has the child on her hip. So that's, those were the occupants along with Mr. Antle. So the government had options here. If it was legally dubious, well, we say you're selling marijuana and gifting pipes. Then go to court. Go to court and get a judge to straighten it out for you. Now, the interesting thing is that since 2008, the Medical Marijuana Act and the 2016 MRTMA, both voter initiatives, as an attorney in Michigan, both of those laws gave me a lot to do for many, many years. But that's not where clearly established comes into play. Clearly established comes into play on whether the constitutional violation, not the state laws, but whether the constitutional violation. Now, I laid out in the briefing a lot of general propositions. And that was as narrow as I could get them. But basically, we know that urinating is a private thing. It's been recognized by the U.S. Supreme Court. We know that the key is not necessarily the length of time the person asks to go to the restroom. The key is whether or not the circumstances of the detention were necessary. A client was detained collaterally to a search warrant. Probable cause as to him in particular was never established. Never even attempted. When he came out of the house, he was wearing jeans, no shoes, no shirt. Not a lot of place to hide marijuana or anything else that you might want to destroy. It's first thing in the morning. He just got up, probably. That's not in the record. Sorry. So does the record indicate whether he was patted down? Unless it's on the video, I would have to rely on that. I don't think either of us specified any factual statements on that. With that, I will. Thank you. Thank you. Thank you both for your argument. The case will be submitted.